# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MISSOURI
### SOUTHERN DIVISION

DEFENDING EDUCATION,

*Plaintiff*,

v.

RICHARD B. WILLIAMS, in his official capacity as President of Missouri State University; DEE SISCOE, in her official capacity as Vice President for Student Affairs at Missouri State University; RABEKAH D. STEWART, in her official capacity as Assistant Vice President for Student Affairs at Missouri State University; GABRIELLE CATLIN, in her official capacity as Director of Student Conduct at Missouri State University; ANDREA M. WEBER, in her official capacity as Assistant Vice President for Student Affairs, Dean of Students, and Chair of the Bias Response Team at Missouri State University; JEFFREY D. MITCHELL, DEVIN SCHEHRER, ASHLEIGH M. LEWELLAN, and DAEZIA C. SMITH, in their official capacities as members of the Bias Response Team at Missouri State University; and MELISSA GOURLEY, TRAVIS FREEMAN, ANN KAMPETER, TIM FRANCKA, CHRISTOPHER WATERS, LYNN PARMAN, and JEFF SCHRAG, in their official capacities as members of the Board of Governors of Missouri State University,

*Defendants*.

Case No. 6:26-cv-03237

**VERIFIED COMPLAINT**

Plaintiff Defending Education brings this action under the First and Fourteenth Amendments to the United States Constitution, *see* 42 U.S.C. §1983, against Defendants and alleges as follows:

## INTRODUCTION

1. The vigilant protection of constitutional freedoms is nowhere more vital than in the community of American universities. *Healy v. James*, 408 U.S. 169, 180 (1972). In theory,

"[t]he college campus is peculiarly suited to serve as a marketplace of ideas and a forum for the robust exchange of different viewpoints." *Solid Rock Found. v. Ohio State Univ.*, 478 F. Supp. 96, 102 (S.D. Ohio 1979).

2. Yet Missouri State University and its officials have enacted a far-reaching policy that is designed to deter, discourage, and otherwise prevent students from expressing disfavored views about the political and social issues of the day.

3. The University's bias policy martials the authority of university administrators to police speech that someone believe demonstrates "bias." The University formally defines "bias" as "language or behaviors that demonstrate bias against persons or groups because of ability, race, color, gender identity, ethnicity, religion, faith, national origin, political orientation, or sexual orientation in which the perpetrator(s) cannot be identified and/or the acts of bias do not rise to the level of discrimination or harassment for purposes of Title IX."

4. So-called "bias incidents" can occur on or off campus, including on social media, subjecting students to the University's speech oversight no matter where they are. The University also keeps records of reported incidents to "monitor" and "track" bias trends.

5. Students accused of "bias incidents" are reported to a "Bias Response Team" led by senior University administrators, who can call in reported students for meetings, try to "educate" them about why the University believes their speech was wrong, and refer them to other University offices with the authority to discipline.

6. Missouri State's bias policy and Bias Response Team chill the open and unfettered discourse that should be central to higher education. The University's bureaucratic

procedures for tackling disfavored speech—and the vague, overbroad, and viewpoint-based definition of bias that triggers those procedures—violate the First and Fourteenth Amendments.

7. Defending Education has members who attend Missouri State University and whose protected speech is chilled by the bias policy. The policy should be declared unconstitutional and enjoined.

## JURISDICTION AND VENUE

8. This action arises under the First and Fourteenth Amendments to the United States Constitution and is brought via 42 U.S.C. §§1983 and 1988.

9. This Court has subject-matter jurisdiction under 28 U.S.C. §§1331 and 1343.

10. Venue is proper under 28 U.S.C. §1391 because all Defendants reside here and a substantial part of the events or omissions giving rise to the claims occurred here.

## PARTIES

11. Plaintiff Defending Education is a nationwide, grassroots, 501(c)(3) nonprofit membership organization whose members include students, parents, and others who are concerned about the state of education in America. DE's mission is to prevent—through advocacy, disclosure, and, if necessary, litigation—the politicization of education. Defending Education is dedicated to preserving civil rights secured by law, including the freedom of expression guaranteed by the First Amendment. *Defending Education Newsroom – Litigation*, DE (archived Apr. 12, 2026), perma.cc/A7A3-VTXB (cataloguing DE's litigation efforts); *see, e.g., Defending Education v. Olentangy Local Sch. Dist. Bd. of Educ.*, 158 F.4th 732 (6th Cir. 2025) (en banc).

12. Defending Education's members include students who attend Missouri State University, including Students A, B, and C.

13. Missouri State University is a public university organized and existing under the laws of Missouri.

14. Defendant Richard B. Williams is President of Missouri State University. Williams is the University's chief executive officer with final authority over all operations of the campus. Williams is responsible for the enactment and enforcement of University policies, including the Bias Response Team. Williams is sued in his official capacity.

15. Defendant Dee Siscoe is the Vice President for Student Affairs at Missouri State University. Siscoe is responsible for all matters of non-academic student life and student conduct, including the Bias Response Team. Siscoe is sued in her official capacity.

16. Defendant Rabekah D. Stewart is the Assistant Vice President for Student Affairs at Missouri State University. Stewart assists in the oversight of all matters of non-academic life and student conduct, including the Bias Response Team. Stewart is sued in her official capacity.

17. Defendant Gabrielle Catlin is the Director of Student Conduct at Missouri State University. Catlin is responsible for oversight and enforcement of the University's student conduct policies. Catlin is sued in her official capacity.

18. Defendant Andrea M. Weber is the Assistant Vice President for Student Affairs and Dean of Students at Missouri State University. Weber is responsible for nearly all aspects of student life at Missouri State University, including policy development and the implementation of the Bias Response Team. Weber is also a member and Chair of the Bias Response

Team, and as such is responsible for all aspects of the Bias Response Team's activities. Weber is sued in her official capacity.

19. Defendants Jeffrey D. Mitchell, Devin Scherer, Ashleigh M. Lewellan, and Daezia C. Smith are members of Missouri State University's Bias Response Team, responsible for receiving and investigating bias incident reports and enforcing the University's bias policy. Mitchell, Scherer, Lewellan, and Smith are sued in their official capacities.

20. Melissa Gourley, Travis Freeman, Ann Kampeter, Tim Francka, Christopher Waters, Lynn Parman, and Jeff Schrag are members of the Board of Governors of Missouri State University. "[A]ccording to the statutes of the state of Missouri," the Board "possesses full power and authority to adopt all needful rules and regulations for the guidance and supervision of the university." The Board is thus responsible for management and oversight of all aspects of the University, including the Bias Response Team. The Board Defendants are all sued in their official capacities.

## BACKGROUND

### I. College Students and Their First Amendment Rights

21. "The First Amendment reflects 'a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open.'" *Snyder v. Phelps*, 562 U.S. 443, 452 (2011) (quoting *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964)). "The right of citizens to inquire, to hear, to speak, and to use information to reach consensus is a precondition to enlightened self-government and a necessary means to protect it." *Citizens United v. FEC*, 558 U.S. 310, 339 (2010).

22. The First Amendment's importance is at its apex at our nation's colleges and universities. "The vigilant protection of constitutional freedoms is nowhere more vital than in

the community of American schools [of higher education]. The college classroom with its surrounding environs is peculiarly the 'marketplace of ideas.'" *Healy*, 408 U.S. at 180 (quoting *Shelton v. Tucker*, 364 U.S. 479, 487 (1960)). The core principles of the First Amendment "acquire a special significance in the university setting, where the free and unfettered interplay of competing views is essential to the institution's educational mission." *Doe v. Univ. of Mich.*, 721 F. Supp. 852, 863 (E.D. Mich. 1989) (citing *Keyishian v. Bd. of Regents*, 385 U.S. 589, 603 (1967)). "Teachers and students must always remain free to inquire, to study and to evaluate, to gain new maturity and understanding; otherwise our civilization will stagnate and die." *Sweezy v. N.H. ex rel. Wyman*, 354 U.S. 234, 250 (1957).

23. The First Amendment's protections, moreover, are "not confined to the supervised and ordained discussion which takes place in the classroom" but extend throughout a university's campus. *Solid Rock Found.*, 478 F. Supp. at 102.

24. Put simply, "First Amendment protections [do not] apply with less force on college campuses than in the community at large." *Healy*, 408 U.S. at 180. "The mere dissemination of ideas—no matter how offensive to good taste—on a state university campus may not be shut off in the name alone of 'conventions of decency.'" *Papish v. Bd. of Curators of Univ. of Mo.*, 410 U.S. 667, 670 (1973). Indeed, "the point of all speech protection is … to shield just those choices of content that in someone's eyes are misguided, or even hurtful." *Hurley v. Irish-American Gay, Lesbian, and Bisexual Group of Boston, Inc.*, 515 U.S. 557, 574 (1995). These principles apply with more force "[i]n our current national condition," not less. *Speech First v. Fenves*, 979 F.3d 319, 339 (5th Cir. 2020).

## II. Universities' Use of Bias Response Teams to Chill Speech

25. Instead of promoting the "robust exchange of ideas," *Keyishian*, 385 U.S. at 603, universities now are often more interested in protecting students from ideas that make them uncomfortable. Universities do this by adopting policies and procedures that discourage speech by students who dare to disagree with the prevailing campus orthodoxy.

26. One tried-and-true method of accomplishing this feat is the campus speech code. Speech codes, according to the Foundation for Individual Rights and Expression (FIRE), are "any university regulation or policy that prohibits expression that would be protected by the First Amendment in society at large." *What Are Speech Codes?*, FIRE (archived Apr. 12, 2026), perma.cc/6Z2K-P37A.

27. Speech codes punish students for undesirable categories of speech such as "harassment," "bullying," "hate speech," and "incivility." Because these policies impose vague, overbroad, content-based (and often viewpoint-based) restrictions on speech, federal courts regularly strike them down. *Spotlight on Speech Codes 2020*, FIRE, at 10 & n.11 (2020), perma.cc/C6Y7-K9MV; *see Fenves*, 979 F.3d at 338-39 n.17 (collecting "a consistent line of cases that have uniformly found campus speech codes unconstitutionally overbroad or vague").

28. Because express speech codes fare poorly in court, universities developed a new, innovative way to deter disfavored speech: so-called "bias response teams." *See Free Speech in the Crosshairs: Bias Reporting on College Campuses*, Speech First, at 3, 5 (2022), perma.cc/5SHF-ZTH2 (reporting that the number of bias response teams at American universities nationwide nearly doubled in the five years between 2017 and 2022).

29. Living up to their Orwellian name, bias response teams encourage students to monitor each other's speech and report incidents of "bias" to university authorities (often anonymously). "Bias" is usually defined incredibly broadly and covers wide swaths of protected speech; in fact, speech is often labeled "biased" based solely on the listener's subjective reaction to it.

30. Students have been reported to bias response teams for writing a satirical article about "safe spaces," tweeting "#BlackLivesMatter," chalking "Build the Wall" on a sidewalk, and expressing support for Donald Trump. *Bias Response Team Report 2017*, FIRE, at 15-18 (2017), perma.cc/UY2D-9W47.

31. After receiving reports of a bias incident, bias response teams typically log the incident, investigate it, meet with the relevant parties, attempt to reeducate the "offender," and can recommend formal or informal discipline.

32. Although universities claim this process is entirely voluntary, they know students do not see it that way. As the Sixth Circuit has explained, an "invitation from [a bias response team] to meet could carry an implicit threat of consequence should a student decline the invitation." *Speech First v. Schlissel*, 939 F.3d 756, 765 (6th Cir. 2019). Even when "there is no indication that the invitation to meet contains overt threats," the University's disciplinary "referral power lurks in the background." *Id.*

33. According to a recent report, "by design, [bias response] teams create an environment of fear that chills speech and dialogue between students of diverse beliefs and perspectives, ultimately silencing speech through self-censorship." *Free Speech in the Crosshairs: Bias Reporting on College Campuses* at 6. Indeed, "even when a [bias response team] disclaims any

formal disciplinary authority, the mere presence of a team consisting of senior administrators responsible for monitoring student expression inevitably chills speech." *Id.* And the "fear of being anonymously reported to university authorities and subjected to process-is-punishment investigations" will make at least some students—as well as faculty, who are often subject to the same policies and procedures—more cautious about what opinions they dare express. *Id.*; *see also Spotlight on Speech Codes 2025*, FIRE, at 7 (2025), perma.cc/UG64-7452. "[T]he posture taken by many Bias Response Teams," in other words, "is all too likely to create profound risks to freedom of expression, freedom of association, and academic freedom on campus." *Bias Response Team Report 2017* at 5.

34. Universities have discovered, through firsthand experience, that their bias response teams chill student speech. The University of Northern Colorado, for example, shuttered its bias response team in 2016, explaining that it had come "at the expense of free speech and academic freedom" and that its so-called "voluntary" processes "made people feel that we were telling them what they should and shouldn't say." The University of Iowa likewise scrapped its plans to create a bias response team, citing their "high failure rate" and their tendency to "become almost punitive."

35. University professors have similarly observed that bias response teams "result in a troubling silence: Students, staff, and faculty [are] afraid to speak their minds, and individuals or groups [are] able to leverage bias reporting policies to shut down unpopular or minority viewpoints." Snyder & Khalid, *The Rise of "Bias Response Teams" on Campus*, The New Republic (Mar. 30, 2016), perma.cc/CS56-LQ7B. Bias response teams, one professor observed, specifically *don't* "handle" speech that actually "rise[s] to the level of either a crime or a code-of-

conduct issue." Ferguson, *Bias-Response Teams Are a Bad Idea*, The Chronicle of Higher Education (June 5, 2023), bit.ly/4tLOJ7V. Instead, they turn on "extreme[ly] vagu[e] … concepts of 'bias,'" such that students may be reported whenever "one person says something that offends another." *Id.* The "effect" is to "chill legitimate speech, including on difficult topics related to race, sexuality, religion, and other identity issues." *Id.*; *see also* Keith Whittington, *Free Speech and the Diverse University*, 87 Fordham L. Rev. 2453, 2466 (2019) ("[E]fforts [by bias response teams] to encourage students to anonymously initiate disciplinary proceedings for perceived acts of bias or to shelter themselves from disagreeable ideas are likely to subvert free and open inquiry and invite fears of political favoritism.").

36. Courts have likewise recognized the chilling effect of bias response teams that resemble Missouri State's. The University of Texas, the University of Michigan, and the University of Central Florida all disbanded their teams after federal courts of appeals held that the teams threatened to chill student speech. The Sixth Circuit held that Michigan's team imposed an "objective chill" on speech because it "act[ed] by way of implicit threat of punishment and intimidation to quell speech." *Schlissel*, 939 F.3d at 765. The Fifth Circuit agreed, stressing that Texas's team "represent[ed] the clenched fist in the velvet glove of student speech regulation." *Fenves*, 979 F.3d at 338. The Eleventh Circuit likewise held that "the average college-aged student would be intimidated—and thereby chilled from exercising her free-speech rights—by subjection to [Central Florida's] bias-related-incidents policy." *Speech First v. Cartwright*, 32 F.4th 1110, 1124 (11th Cir. 2022).

37. Unsurprisingly, the rise of bias response teams is matched by a parallel rise in the percentage of college students who feel that they cannot express controversial opinions

on campus. In a recent survey of almost 70,000 American college students, nearly half of those surveyed reported feeling uncomfortable expressing their views on a controversial political topic in conversations with other students. *2026 College Free Speech Rankings*, FIRE, at 25 (2026), perma.cc/M9LW-RSRJ. Even more felt uncomfortable expressing those views in the classroom or on a social media platform tied to their name, especially when those views disagreed with the views of their professors. *Id.* Well over half of the surveyed students reported self-censoring in conversations with other students and with professors. *Id.* at 26. And this free-speech crisis is politically lopsided. Students who identify as moderate or conservative are less comfortable expressing their views on controversial topics and feel compelled to self-censor more frequently than their liberal peers. *2025 College Free Speech Rankings*, FIRE, at 24, 26 (2025), perma.cc/6RBL-WQHT.

38. At the same time, many students say that outside speakers with certain viewpoints on timely political and cultural issues should not be invited, or even allowed, to speak on campus. *2026 College Free Speech Rankings* at 26-27. And less than a quarter of students feel that it is "very" or "extremely" likely that their university's administration would defend a speaker's right to express their views if "a controversy over offensive speech were to occur." *Id.* at 25.

39. Missouri State is no exception. A 2026 free speech ranking placed Missouri State 123rd among 257 ranked schools, and the University received an "F" grade for its speech climate. *College Free Speech Rankings – Missouri State University*, FIRE (2026), perma.cc/RW6S-GPZD. Nearly half of the University's students report self-censoring because they fear reprisal for their expression. *Id.* And the problem is getting worse: compared to previous years,

Missouri State's scores for "openness," "political tolerance," "comfort expressing ideas," and "self-censorship" have all gone *down*. *Id.*

### III.   The University's Bias Response Team

40.   Missouri State University has created a "Bias Response Team" designed to deter, suppress, and punish disfavored and controversial speech. The Team is housed within the Dean of Students' Office, itself part of the Division of Student Affairs. The Division of Student Affairs is also responsible for enforcing the student code of conduct.

41.   The University defines "bias" as "language or behaviors that demonstrate bias against persons or groups because of ability, race, color, gender identity, ethnicity, religion, faith, national origin, political orientation, or sexual orientation in which the perpetrator(s) cannot be identified and/or the acts of bias do not rise to the level of discrimination or harassment for purposes of Title IX."

42.   The precise contours of what the University considers a "bias incident" and what it does not are unclear, and the University's circular description of a "bias" as "language or behaviors that demonstrate bias" provides little guidance. One aspect of the policy is unambiguous however: It plainly encompasses pure speech. The University's definition itself covers so-called biased "language." And students can be reported for, among other things, a biased "Email," "verbal" and "written" offenses, and "phone" communications. Bias incidents can occur "on and off campus," including in "Virtual Space[s]" like social media. The standard for "bias," moreover, is expressly lower than the standard for actionable "discrimination or harassment for purposes of Title IX."

43. The University, for example, encourages students to "report situations in which they were called an inappropriate name or [were] the recipient of a bias-related message." Other constitutionally protected forms of speech, like "Hate Speech" and so-called "Micro-Aggressions," are also reportable. The Board of Governors, the University's highest authority, stated when establishing the Bias Response Team that "comments designed to offend" would fall within the Team's purview. Indeed, as a former Missouri State president explained, reportable "bias" includes "little micro aggressions, little incidents [that] occur in a residence hall," and speech "on social media" or "in class."

44. University records obtained in an open records request confirm that many reports of bias incidents involve protected speech. In just one year, for example, bias incidents reported to the Bias Response Team included:

   a. A report that, while riding a University-operated bus, the complainant "overheard" a driver "radioing in from another bus" who stated that "[a] little oriental girl is waiting at the stop to go to bear park north."

   b. A report that a "student called a University administrative office with a question about graduation" and "when the administrator asked her for her contact information so she could get back to her with an answer, the student yelled 'Are you speaking English at all!!!' and hung up."

   c. A report that, on a "bulletin board display that invited students to write what identities they were thankful for," a "student had written they were thankful 'for bein' a dyke.'"

45.    The University publicly promotes the Bias Response Team and "encourage[s]" "[a]ny University community member impacted by bias acts … to report the behavior to the Bias Response Team using the on-line reporting form." The Dean of Students Office asks students to "[c]ollaborate" and "partner with us" by "[r]eport[ing] instances of bias to the Bias Response Team."

46.    Bias complaints can be submitted online via a "Bias Incident Report Form" on the University's website. The main webpage for Missouri State's Dean of Students Office, which encourages students to "contact us if you are confronted by an issue or concern," prominently displays various reporting mechanisms, including for bias incidents. Beneath the tagline "I want to Report a Bias Incident," the page includes a link to "File [a] Bias Incident Report." The Dean of Students Office page also includes a separate link to the page for the "Bias Response Team."

47.    Importantly, complaints about biased speech can be submitted anonymously. Indeed, when submitting a bias incident report, complainants are instructed that they "have the option to file anonymously." The University promises to keep those reports "confidential to the extent possible." Even if students file anonymously, they are still encouraged to specify "what outcome [they] hope will result from [their] report."

48.    When reporting biased speech, complainants specify the date, time, and location of the "incident." They can also give key details about the "involved parties," including the offender's name, gender, age, University ID number, residential address, phone number, and email address. Complainants are also instructed to provide "as much information as [they] can about the incident," including "identifying information," a "description of" the biased speech

or conduct, and the "name and contact information of witnesses." And they are asked "who else, if anyone, has been notified about the incident." Complainants are also asked to attach "supporting documents," such as "[p]hotos, video, and email."

49. The University invites reports on all kinds of supposed bias. In addition to suggesting several kinds of reportable bias—including bias expressed in "Verbal" or "Written" form and bias expressed on the "Phone" or over "Email/Online"—the Bias Incident Reporting Form allows complainants to report "Other" kinds of bias as well. So too for the "[n]ature" of the reported bias: In addition to purported bias based on familiar categories like "Age," "Race/Ethnicity," "Religion," and "Sexual Orientation," the form invites complaints based on "Other" categories too.

50. Complainants can report a bias incident even if they were not a "victim" of the alleged speech. The Bias Incident Reporting Form states that the "form can be completed" by "victims of bias-related incidents or witnesses to them," and the University "encourage[s]" anyone "impacted" by bias to submit a report.

51. The University has created the "Bias Response Team" to respond to bias incidents. The team is chaired by the Dean of Students and includes other senior administrators from the Residence Life, Campus Recreation, and International Programs departments, as well as an attorney from the General Counsel's Office.

52. The Team "provide[s] an organized and coordinated method of assessment of the severity of an incident" and "coordinate[s] an appropriate response." The University is "fully committed to addressing incidents of bias" through the Bias Response Team.

53. The Bias Response Team "review[s]" and "promptly respond[s] to bias-related incidents" reported by "campus community members." When it receives a bias incident report, the Team investigates. Indeed, according to the University's then-president, "[o]ne of the reasons" Missouri State "put this team together was to have a group of people" who could "get … in" on "short notice" and "see what really happened" when a bias incident is reported. The Team then "interven[es]" with "a variety of" tools designed to discourage disfavored speech.

54. The Team may contact reported students and ask them to participate in "discussion," "training," and "counseling" intended to educate them about why the University disapproves of their speech. The goal is to "engage [reported] students and make sure they realize that" the University does not look favorably upon their speech.

55. The Team also keeps records of reported incidents, ostensibly to "monito[r] student experiences for trends and issues negatively impacting campus climate."

56. If the Team believes there is a "patter[n]" of bias among a particular group of students, it may "call everybody together" for "informal training."

57. Finally, although the University claims the Bias Response Team's measures are non-punitive, the Team will "refer the incident to the appropriate University official or committee" if it believes further action is warranted.

58. The University claims the Bias Response Team's interventions are geared towards "mediation" and "consensus-building," but, in reality, the Team is far from a neutral arbiter. Instead, the Team promises to be an "advocate for … individuals and groups impacted by acts of bias." The Team will challenge "those engaging in speech contrary to" what the

Team considers Missouri State's "values," including "diversity and inclusion," and "support … those affected by" such "speech."

59.     The University even encourages students to police dissenting speech *before* bias incidents are reported: One of the Bias Response Team's "focus[es]" is "educating the campus community about" the University's "values" and "training bystanders on how to respond when they witness" speech that diverges from those values.

60.     Since it first established the Bias Response Team, the University has doubled down on its commitment to using the Team to discourage unwanted speech. In 2020, the Board of Governors directed University authorities to "[e]nhance intervention strategies for the … bias response team to address incidents of bias involving race or another protected class." The University's then-president agreed, promising to "refocus [the] Bias Response Team and provide the team with stronger tools to intervene."

## IV.     The Effect of the University's Bias Response Team on Defending Education's Members

61.     Defending Education's members who attend the University are suffering concrete injuries as a direct result of the University's unconstitutional policies and actions. These students want to engage in speech covered by the University's bias policy, but they credibly fear that the expression of their deeply held views will be considered "biased," "offensive," "discriminatory," or the like.

62.     **Student A.** One DE member, Student A, is a Sophomore at Missouri State University.

63.     Student A is politically conservative and holds views that are unpopular, controversial, and in the minority on campus.

64. For example, Student A believes that sex is fixed at birth and immutable. He believes that God created only two sexes—male and female—and that sex is determined by biology, not by a person's "feelings." He thinks that "affirming" someone's non-biological "gender identity" harms that person because it encourages them to believe something untrue. As a Christian, Student A believes the best way to love someone is to encourage them to embrace the way God created them, including their biological sex. When Student A addresses or refers to biological men, he wants to call them "he" and "him," not "she" and "her; and when he addresses or refers to biological women, he wants to call them "she" and "her," not "he" and "him."

65. Student A believes that abortion is wrong and should be illegal in most cases. He believes that life begins at conception, and that mothers and fathers should not be able to "choose" to end an innocent child's life. Though Student A believes that abortion is wrong at any stage of pregnancy, he feels it is more inhumane at later stages of pregnancy. Student A thinks it is nonsensical that some people promote animal rights but not the rights of unborn children. And he believes that Planned Parenthood and other organizations that encourage mothers to procure abortions are a system of evil pretending to do good.

66. Though he bears no ill will towards members of the LGBT community, Student A believes that marriage is between one man and one woman. He thinks that giving same-sex marriages the same benefits as heterosexual marriages is harmful for society. He believes that homosexual conduct is sinful, like any sex outside of marriage, but the LGBT movement en-courages people to identify with and take pride in their sinful behavior. Similarly, Student A believes that the ideal arrangement for raising children is in a nuclear family with one father

and one mother, rather than a "family" with multiple fathers, multiple mothers, and/or a "surrogate parent."

67. Student A believes that African-American men are arrested for criminal conduct at disproportionate rates not because of systemic racism in policing but because they commit crimes at greater rates than other groups, in part due to harmful cultural trends like single-parent households and failing schools in African-American communities. Student A believes the real problem in our criminal justice system is not overenforcement, but underenforcement. He also believes that law enforcement agencies are often underfunded.

68. While Student A agrees that immigration has played a key role in American history, he thinks that anyone who wishes to immigrate to our country must do so legally. He thinks our government should increase efforts to deport and keep out criminal illegal immigrants. Student A also believes that it is dangerous for our shared culture and national security to allow in too many immigrants who do not share our nation's values or are more loyal to their home country than they are to the United States. Student A believes that illegal immigrants should not be allowed to access public benefits or other privileges extended to American citizens and lawful residents, like in-state tuition at public universities.

69. Student A also thinks that our government devotes too much attention and too many resources to things that should be left to churches, nonprofits, and civil society to handle. For example, he believes that many social welfare and entitlement programs administered by our government should be curtailed or ended and replaced by private charity.

70. Student A enrolled at Missouri State University because he wanted to learn in a challenging environment where students and faculty are free to engage in lively, fearless debate and deliberation.

71. Student A wants to engage in open and robust intellectual debate with his fellow students about these topics in the classroom, in other areas of campus, online, and in the broader community.

72. When another classmate or another member of the university community voices contrary views about these and other controversial topics, including gender, abortion, so-called same-sex marriage, crime statistics, immigration, and welfare spending, Student A wants to point out the flaws in their arguments and convince them to change their minds.

73. Student A wants to speak directly to his classmates about these topics, and he wants to talk frequently and repeatedly on these issues. Given his views, Student A knows that many of these conversations will be heated and passionate. But he wants to have these conversations because he feels strongly about these issues.

74. Student A speaks about these issues in small circles of friends when he knows that they share his opinions and are unlikely to report him for sharing his beliefs.

75. But the University's bias policy and Bias Response Team—and Student A's own personal experiences on campus—make him reluctant to openly express his opinions or have these conversations in the broader University community.

76. Student A does not fully express himself or talk about certain issues because he knows that other students, faculty members, or others will likely report him to University officials for committing a "bias incident." Because the definition of "bias" is so broad and

vague, Student A is confident that someone will find his speech to be "biased." He worries that there are other students who will "catch him" engaging in "biased" speech and that the University will take action against him. For example, Student A is afraid that the Bias Response Team will keep a record on him, call him in for meetings with administrators, try to "educate" him about why his speech is wrong, and refer reports about him speech to other University offices that may seek to discipline him.

77. **Student B.** Another DE member, Student B, is a Sophomore at the University.

78. Student B is politically conservative and holds views that are unpopular, controversial, and in the minority on campus.

79. For example, Student B believes that sex is determined at conception and immutable and that every person is either male or female. He does not believe that "gender identity" is a coherent category separate from biological sex. He does not think it is appropriate to refer to someone using biologically inaccurate "preferred pronouns" or "chosen names." He wants to refer to biological males as "he," not "she," and biological females as "she," not "he." In fact, Student B thinks that affirming someone's non-biological "gender identity" is harmful to that person.

80. Student B also believes that abortion is immoral because life begins at conception and it is wrong to take an innocent life. He thinks that abortion should be illegal in all circumstances except when it is necessary to protect the life of the mother. Student B thinks abortion is, sadly, disproportionately common in low-income and minority communities. And he believes that the pro-abortion movement pressures vulnerable young mothers—especially

those in low-income and minority communities—to seek abortions even when it is not in the mother's best interest.

81.     Student B thinks that Diversity, Equity, & Inclusion ("DEI") practices are fundamentally racist. He believes that allocating resources or giving special treatment to racial minorities because of their skin color is just as wrong as it would be to do the same for white people.  In Student B's view, such practices hurt both white people (because they are denied equal opportunity) and the racial minorities they purport to help (because they assume members of those minorities are incapable of achievement on their own merit). And he believes that people today, white or otherwise, are not responsible for the sins of people in the past who happened to share their skin color.

82.     Student B supports a strong and assertive U.S. foreign policy. He believes that the chief goal of our foreign policy should be to promote and protect the interests of American citizens. Student B also thinks that the U.S. military should be used to protect U.S. interests abroad—including in countries and regions like Venezuela, Cuba, and the Middle East—and he thinks that American military involvement can be a force for good in the world.

83.     Student B enrolled at Missouri State University because he wanted to learn in a challenging environment where students and faculty are free to engage in lively, fearless debate and deliberation.

84.     Student B wants to engage in open and robust intellectual debate with his fellow students about these topics in the classroom, in other areas of campus, online, and in the broader community.

85. When another classmate or another member of the university community voices contrary views about these and other controversial topics, including transgender issues, abortion, racism and DEI, and foreign policy, Student B wants to point out the flaws in their arguments and convince them to change their minds.

86. Student B wants to speak directly to his classmates about these topics, and he wants to talk frequently and repeatedly on these issues. Given his views, Student B knows that many of these conversations will be heated and passionate. But he wants to have these conversations because he feels strongly about these issues.

87. Student B speaks about these issues in small circles of friends when he knows that they share his opinions and are unlikely to report him for sharing my beliefs.

88. But the University's bias policy and Bias Response Team—and Student B's own personal experiences on campus—make him reluctant to openly express his opinions or have these conversations in the broader University community.

89. Student B does not fully express himself or talk about certain issues because he knows that other students, faculty members, or others will likely report him to University officials for committing a "bias incident." Because the definition of "bias" is so broad and vague, Student B is confident that someone will find his speech to be "biased." He worries that there are other students who will "catch him" engaging in "biased" speech and that the University will take action against him. For example, Student B is afraid that the Bias Response Team will keep a record on him, call him in for meetings with administrators, try to "educate" him about why his speech is wrong, and refer reports about him speech to other University offices that may seek to discipline him.

90. **Student C.** A third DE member, Student C, is a Senior at the University.

91. Student C is politically conservative and holds political beliefs that are unpopular, controversial, and in the minority on campus.

92. For example, Student C strongly opposes illegal immigration, and she does not believe that illegal immigrants should be eligible to receive public benefits or in-state tuition. Student C thinks that, when illegal immigrants use public resources without contributing, it is not fair for middle-class Americans who have to support those services with their tax dollars. She thinks that many illegal immigrants engage in criminal behavior and get away with it because our government neglects to enforce our immigration laws and our media refuses to criticize immigrants. Student C fully supports President Trump's immigration enforcement measures, and she thinks that immigration enforcement agents are unfairly demonized by the media.

93. Student C believes that life begins at conception and that abortion should be illegal in most cases. She also believes that groups like Planned Parenthood pressure vulnerable women into getting abortions. She thinks it is wrong to encourage a pregnant woman to abort her child simply because the child may suffer from a medical condition. Student C believes that every child should have a chance to live, even if only for a few hours.

94. Student C also believes that God created humans with only two sexes, male and female, and that biological sex is determined at conception and immutable. She does not believe that someone is a man or a woman just because they "feel" like a man or a woman; rather, sex is determined by a person's chromosomes. Student C thinks it is harmful to affirm someone's non-biological gender identification, especially for children, because it encourages them

to believe something untrue about their body. Student C does not want to refer to a biological male as "she" or a biological female as "he." She thinks conversations around so-called transgender identity too often focus on individuals' emotions as opposed to biological fact and medical reality.

95. Student C enrolled at Missouri State University because she wanted to learn in a challenging environment where students and faculty are free to engage in lively, fearless debate and deliberation.

96. Student C wants to engage in open and robust intellectual debate with her fellow students about these topics in the classroom, in other areas of campus, online, and in the broader community.

97. When another classmate or another member of the university community voices contrary views about these and other controversial topics, including immigration, abortion, and gender identity, Student C wants to point out the flaws in their arguments and convince them to change their minds.

98. Student C wants to speak directly to her classmates about these topics, and she wants to talk frequently and repeatedly on these issues. Given her views, Student C knows that many of these conversations will be heated and passionate. But she wants to have these conversations because he feels strongly about these issues.

99. Student C speaks about these issues in small circles of friends when she knows that they share her opinions and are unlikely to report her for sharing her beliefs.

100. But the University's bias policy and Bias Response Team—and Student C's own personal experiences on campus—make her reluctant to openly express her opinions or have these conversations in the broader University community.

101. Student C does not fully express herself or talk about certain issues because she knows that other students, faculty members, or others will likely report her to University officials for committing a "bias incident." Because the definition of "bias" is so broad and vague, Student C is confident that someone will find her speech to be "biased." She worries that there are other students who will "catch her" engaging in "biased" speech and that the University will take action against her. For example, Student C is afraid that the Bias Response Team will keep a record on her, call her in for meetings with administrators, try to "educate" her about why her speech is wrong, and refer reports about her speech to other University offices that may seek to discipline her.

## COUNT I
### Violation of the First Amendment
### (Bias Response Team)

102. Plaintiff repeats and realleges each of the prior allegations in this complaint.

103. The University's definition of a "bias incident" encompasses speech that is fully protected under the First Amendment.

104. The University's bias policy is a content-based and viewpoint-based restriction on speech. It is presumptively unconstitutional and cannot survive strict scrutiny.

105. The policy is unconstitutionally overbroad as it encompasses protected speech, and there are a substantial number of instances where the policy cannot be applied consistent with the First Amendment.

- 26 -

106. Students can face disciplinary consequences for committing "bias incidents," as the Bias Response Team will "refer the incident to the appropriate University official or committee" for additional action. The bias incident protocol also objectively chills speech by threatening students with negative consequences and burdensome administrative processes—including investigations, meetings with University administrators, sessions designed to educate students on why their speech is disfavored, tracking and recording reported incidents, and monitoring for bias "trends" on campus. *See Schlissel*, 939 F.3d at 764-65; *Fenves*, 979 F.3d at 330-35; *Cartwright*, 32 F.4th at 1123-24.

107. This overbroad policy chills protected speech and expression.

108. Defendants adopted this unconstitutional policy under color of state law.

## COUNT II
### Violation of the First and Fourteenth Amendments: Void for Vagueness
### (Bias Response Team)

109. Plaintiff repeats and realleges each of the prior allegations in this complaint.

110. The bias policy gives students insufficient guidance about what speech is permitted and what speech isn't, and the policy authorizes arbitrary and discriminatory enforcement.

111. The policy defines "bias" as "language or behaviors that demonstrate bias against persons or groups because of ability, race, color, gender identity, ethnicity, religion, faith, national origin, political orientation, or sexual orientation in which the perpetrator(s) cannot be identified and/or the acts of bias do not rise to the level of discrimination or harassment for purposes of Title IX." The policy does not define "bias" or any other operative term. In fact, the policy circularly—and unhelpfully—defines "bias" as actions "that

demonstrate bias." And although the policy suggests that not all bias incidents are actionable "harassment or discrimination," it frequently conflates the two concepts in public statements to the student body.

112. The bias policy encompasses speech and conduct on and off campus, including statements made in "[v]irtual [s]pace[s]" like social media.

113. The policy turns on unpredictable assessments about whether student speech "demonstrate[s] bias" against a person or group "because of" their identity. Those terms, along with the listed identities, are undefined and subjective. They "beg for clarification." *Fenves*, 979 F.3d at 332.

114. The policy's vague standard deprives students of "a reasonable opportunity to understand what conduct [the policy] prohibits." *Hill v. Colorado*, 530 U.S. 730, 732 (2002). The policy is also "susceptible to discriminatory or arbitrary enforcement." *Bell v. Keating*, 697 F.3d 445, 462 (7th Cir. 2012).

115. The bias policy is thus void for vagueness.

116. Defendants adopted this unconstitutional policy under color of state law.

**WHEREFORE**, Defending Education respectfully requests that this Court enter judgment in favor of Plaintiff and against Defendants and provide the following relief:

A. A declaratory judgment that the University's bias policy violates the First and Fourteenth Amendments on its face and as applied;

B. A permanent injunction barring Defendants from enforcing the University's bias policy;

C.     A permanent injunction barring Defendants from investigating, logging, threatening, referring, or punishing (formally or informally) students for bias incidents;

D.     A preliminary injunction granting the relief specified above during the pendency of this action;

E.     Plaintiff's reasonable costs and expenses of this action, including attorneys' fees, per 42 U.S.C. §1988 and all other applicable laws; and

F.     All other relief that Plaintiff is entitled to.


Dated: April 21, 2026          Respectfully submitted,

*/s/ Edward D. Greim*          */s/ J. Michael Connolly*
Edward D. Greim (MO 54034)     J. Michael Connolly *
Sarah R. Pineau (MO 74483)     Cameron T. Norris *
Michael Scott (MO 74361)     Paul R. Draper *
GRAVES GARRETT GREIM LLC     CONSOVOY MCCARTHY PLLC
1100 Main Street, Suite 2700     1600 Wilson Blvd., Suite 700
Kansas City, MO 64105     Arlington, VA 22209
Tel.: (816) 256-3181     (703) 243-9423
Fax.: (816) 222-0534     mike@consovoymccarthy.com
edgreim@gravesgarrett.com     cam@consovoymccarthy.com
spineau@gravesgarrett.com     paul@consovoymccarthy.com
mscott@gravesgarrett.com

*Counsel for Plaintiff*          *\* pro hac vice applications forthcoming*

## VERIFICATION

I, Sarah Perry, declare as follows:

1. I am the Vice President and Legal Fellow of Defending Education, the plaintiff in this case.

2. I have reviewed this complaint.

3. For the allegations within my personal knowledge, I believe them all to be true.

4. For the allegations not within my personal knowledge, I believe them all to be true based on my review of the cited policies and documents and based on my conversations with members of Defending Education, including Students A, B, and C.

5. I declare under penalty of perjury that the foregoing is true and correct.

Executed on April 20, 2026

_____
Sarah Perry
Vice President and Senior Legal Fellow
Defending Education